*Martinez Mack v. State*, No. 2813, *Arthur Cheeks v. State*, No. 2836 (Consolidated) of the 2018 Term. Opinion by Moylan, J.

**UNLAWFUL POSSESSION OF FIREARMS – PANDEMONIUM – THE DEFENESTRATION OF MIDDLE GOVANS – MASS EXODUS – THE CONTENTIONS – OPINION TESTIMONY, LAY AND/OR EXPERT – <u>RAGLAND V. STATE</u> – <u>JOHNSON V. STATE</u> – WHO GETS TO MAKE THE CLOSE CALLS? – AN <u>ARGUENDO</u> HYPOTHETICAL TIMES TWO: HARMLESS ERROR – ENHANCED SENTENCING AND REQUIRED NOTICE – AN ILLEGAL SENTENCE: IN THE SIMPLE SENSE AND IN THE PLUPERFECT SENSE – NON-PRESERVATION SQUARED – A FAMILIAR ACE IN THE HOLE: INCOMPETENCE OF COUNSEL – RELEVANCE AND MINIMALISM – A NEED FOR DISCIPLINED APPELLATE ADVOCACY – "PRAISE THE LORD AND PASS THE AMMUNITION" – AN <u>ARGUENDO</u> ALTERNATIVE**

Circuit Court for Baltimore City
Case No. 118113017

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2813 and No. 2836 (Consolidated)

September Term, 2018

_____

MARTINEZ MACK

V.

STATE OF MARYLAND


ARTHUR CHEEKS

V.

STATE OF MARYLAND

_____

Meredith,
Berger,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),


JJ.

_____

Opinion by Moylan, J.

_____

Filed: January 31, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The appellants, Martinez Mack and Arthur Cheeks, were jointly tried in the Circuit Court for Baltimore City by a jury, presided over by Judge Althea M. Handy. The jury convicted both appellants of 1) possession of a firearm after having been convicted of a disqualifying felony, 2) possession of a handgun on his person, and 3) possession of ammunition. Each appellant has filed a separate and timely appeal, but this Court has consolidated the two appeals for purposes of oral argument and opinion.

## Pandemonium

The police approached 5404 Midwood Road on March 13, 2018, at approximately 6:00 p.m. to execute a "No knock" search and seizure warrant. Officer Jeremy Zimmerman led a team of five officers through the front door of the house and then through the door of the first-floor apartment that was the precise target of the search. As the ramrod hit the outside door and the searching team, with a single voice, proclaimed, "Police! Search warrant!", pandemonium ensued on the inside as a rogue's gallery of guilty consciences bolted for the escape hatch.

## The Defenestration of Middle Govans

Conventional wisdom holds that the celebrated Defenestration of Prague in 1618 sparked the Thirty Years War (1618-1648). The lesser defenestration of 2018 now before us, albeit less earthshaking than its 400-year-old predecessor, was no less spectacular. The trigger was the "No-knock" entry of the police through the front door. As the police ramrod hit that portal, 5404 Midwood Road figuratively exploded. The rupture point was the rear window, as fleeing mountebank after fleeing mountebank, each with handgun in hand, burst forth from that sally-port into a Govanstowne backyard.

**Mass Exodus**

As the heavy infantry hit the front of the house, Lieutenant Charles James and Sergeant Michael Mercado were deployed "to cover the back door." They were not yet quite on station, however, when the mass exodus fell full upon them. The first fleeing mountebank to hit the ground was the appellant Mack. Lieutenant James and Sergeant Mercado were still running toward the rear entrance when Mack "ran across [their] path with a gun in his hand." Sergeant Mercado recognized Mack, but it was Lieutenant James who took off after him, first over a fence and then across an empty field. The lieutenant failed to keep pace and Mack, at least temporarily, got away. The steeplechase and marathon, however, had not totally been in vain. In carefully retracing his steps across the empty field, Lieutenant James spotted on the ground, precisely in the line of earlier flight, a "silver-colored revolver." It was a .357 Magnum with five cartridges in its chamber. They became, respectively, State's Exhibits 14 and 15.

Meanwhile, back in the backyard, the second leg of the relay was already afoot, nothwithstanding the fact that the runner dropped his .32 caliber baton. As first the appellant Mack and then Lieutenant James were clearing the fence, Sergeant Mercado saw "another individual at the window… trying to get out." Sergeant Mercado took note of the "butt of a firearm, the handle." He could not honestly remember whether the butt of the gun was "in his dip or in his hand." As he momentarily turned to see Lieutenant James going over the fence, however, he heard a "metallic clank" and looked back to see the "same firearm" hit the pavement in front of him. He also saw Cheeks fall to the floor of the alleyway but immediately rise up again to run down the alley. Sergeant Mercado

attempted to give chase but could not keep up. Sergeant Mercado broadcast a description of a fugitive wearing a "blue hoodie" and "light-colored jeans." Shortly thereafter, the sergeant heard via radio that a suspect had been detained. He responded to the location and identified the detainee as the man he had been chasing, the appellant Cheeks. Sergeant Mercado knew it was Cheeks because he "recognized his face and skin tone" and saw "scratch marks on his hand from where he had fallen." He also noticed that Cheeks was breathing "pretty hard", a tell-tale symptom of a well-run race.[1] The legal sufficiency of the evidence to support the convictions is not challenged by Cheeks on this appeal.

## The Contentions

We are presented with a total of four appellate contentions. Appellant Cheeks, alone, raises two contentions:

1. The trial court erred in permitting an officer, without being qualified as an expert, to testify that "surfaces that are coarse or rubberized or uneven typically do not yield latent prints"; and

2. The trial court erred in imposing an enhanced sentence for wearing, carrying, or transporting a handgun where the State failed to provide pre-trial notice of its intention to seek an enhanced penalty.

Appellant Mack, alone, raises the two other contentions:

3. The trial court erred by admitting evidence describing Mack as being under surveillance and the target of an investigation and search warrant by a drug enforcement unit, because a) such evidence was not relevant to any contested issue, b) it was hearsay evidence of "other crimes", and c) it was unfairly prejudicial; and

---

[1] The third of the musketeers to come out of the window was neither caught nor identified. The true identity of Aramis remains a cold case.

4. The State failed to prove an essential element of the ammunitions charge because it did not present evidence that any of the cartridges contained "explosive or incendiary materials designed and intended for use in a firearm".

## Opinion Testimony, Lay And/Or Expert

The first contention of the appellant Cheeks is that the lead police investigator, Officer Zimmerman, was erroneously permitted to offer an expert opinion without having been qualified to do so. Officer Zimmerman described how after the conclusion of the raid on 5404 Midwood Road, he and the rest of the raiding party retired to the Northern District Station to process the evidence. Officer Zimmerman was a five-year veteran with the Baltimore City Police Department, assigned to a District Action Team charged with enforcing drug laws and looking for violent offenders and other handgun crimes. The two guns that had been recovered were photographed. The following colloquy then occurred:

> [THE STATE]: And can you, in terms specifically in terms of did you receive any training in terms of fingerprint or latent fingerprints, how to gather, how to preserve, what they are or anything like that?
>
> [ZIMMERMAN]: Yes.
>
> [THE STATE]: Can you describe what your training was relating to fingerprints and latent fingerprints?
>
> [ZIMMERMAN]: Sure. We're trained on the types of surfaces that are most likely to yield a latent print, just a fingerprint left behind from the oil residue on your fingers. A fingerprint is unique to every individual, so, it can be used to identify people. The importance of evidence preservation. So, wearing latex gloves when you're handling things. Trying not to touch surfaces where latent prints might be available.
>
> [THE STATE]: You mentioned that you got some training about different types of surfaces as it relates to, can you be more specific about what you're referring to?

[ZIMMERMAN]: Sure. Surfaces that are coarse or rubberized or uneven typically do not yield latent prints.

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

(Emphasis supplied). With reference to that exchange, the appellant Cheeks now contends, "As Officer Zimmerman was not qualified as an expert, he should not have been permitted to testify about the types of surfaces likely to yield latent prints." Cheeks relies on Maryland Rule 5-702, Testimony by experts, which provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

(Emphasis supplied.)

The precise proposition under scrutiny, of course, is Officer Zimmerman's opinion that:

**SURFACES THAT ARE COARSE OR RUBBERIZED OR UNEVEN TYPICALLY DO NOT YIELD LATENT FINGERPRINTS.**

The entire content of the significant legal argument now before us is based on two words and not a syllable more:

[DEFENSE COUNSEL]: **OBJECTION.**

THE COURT: **OVERRULED.**

In supposing a cogent reason for defense counsel's objection and in proffering a feasible rationale for the trial judge's overruling of that objection, we rely, of necessity, on reasonable inference. The gist of the debate was by no means loud and clear.

## Ragland v. State

Cheeks relies almost exclusively on the opinion of the Court of Appeals in Ragland v. State, 385 Md. 706, 870 A.2d 609 (2005). That is a very reasonable reliance. The probing analysis of Judge Raker in that case is the indispensable point of departure for any meaningful examination of the ambiguous borderland between a lay opinion pursuant to Rule 5-701 and an expert opinion pursuant to Rule 5-702. Within that troubled No-Man's-Land, the choice of how to qualify the testimony was frequently not a clear-cut binary one. It was, rather, the ambiguously disturbing option of which way to turn when two ostensibly diverging rules, and two diverging justifications, overlapped. It was here, for many years at least, that either rule might reasonably be relied upon to resolve the case at hand. Judge Raker's opinion in Ragland has now in major measure eliminated that heretofore vexing overlap. Ragland is where every modern analysis must begin.

In setting the stage, the Ragland opinion described the evidentiary border zone as a strategically sensitive area:

> The issue presented in this case lies at the intersection of two Maryland evidentiary rules governing opinion testimony. That issue is as follows: Where a witness has first-hand knowledge of the events that form the subject of his or her testimony, may the witness offer, as "lay opinion testimony," opinions formed about those events based on specialized knowledge, skill, experience, training, or education?

385 Md. at 716. (Emphasis supplied.) Ragland went on:

> The language of the two Rules thus divides the universe of opinion testimony into two categories, each bearing restrictions that the other does not.

385 Md. at 717. (Emphasis supplied.)

Just as Rule 5-702, Testimony By Experts, supra, covers part of the field of opinion testimony, another part of that field is covered by Rule 5-701, Opinion Testimony By Lay Witnesses:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

(Emphasis supplied.)

Judge Raker's opinion, 385 Md. at 717, at the outset described and contrasted the two forms of opinion testimony:

> Expert opinion testimony is testimony that is based on specialized knowledge, skill, experience, training, or education. Expert opinions need not be confined to matters actually perceived by the witness. Lay opinion testimony is testimony that is rationally based on the perception of the witness.

(Emphasis supplied.)

To render an expert opinion pursuant to Rule 5-702, the witness must be qualified as an expert as a result of "knowledge, skill, experience, training, or education" and must be expressly accepted by the trial court as an "expert." The expert, on the other hand, need not be testifying about something that the expert has personally observed or experienced. The expert opinion may be in response to hypothetical questions posed by counsel.

To give a lay opinion pursuant to Rule 5-701, by contrast, the witness must be testifying on the basis of personal perception. In probing for the essence of a "lay opinion," Ragland, 385 Md. at 717-18, quoted with approval from the United States Court of Appeals for the Third Circuit.

> The United States Court of Appeals for the Third Circuit offered a helpful explanation of lay opinion testimony in Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190 (3rd Cir.1995), a case cited favorably in the Advisory Committee's note to the 2000 amendment to Fed.R.Evid. 701, discussed *infra*. The court stated as follows:
>
> "The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.... Other examples of this type of quintessential Rule 701 testimony include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, the value of one's property." Id. at 1196-98.

(Emphasis supplied.)

The dichotomy between Rule 5-701 and Rule 5-702 has been on most occasions relatively simple to handle. The dichotomy between qualifying to give a lay opinion and qualifying to give an expert opinion has been on most occasions similarly relatively simple to handle. On rarer occasions, however, a complicating factor that had absolutely bedeviled analysis in this area, at least until the filing of Ragland v. State on March 18, 2005, was that qualifying to give a lay opinion and qualifying to give an expert opinion were not mutually exclusive phenomena. When a witness qualified to give but one type of opinion, lay or expert, that occasioned no academic headache. What, however, was the evidentiary

8

bottom line when the same witness qualified to give both types of opinion? <u>Ragland</u> posed the problem:

> <u>This bisection is imperfect</u>, however, <u>because at least one class of opinions potentially falls within both categories</u>. A witness who has personally observed a given event may nonetheless have developed opinions about it that are based on that witness's specialized knowledge, skill, experience, training, or education. The question then becomes <u>whether the fact of personal observation will permit admission of the opinion by a lay witness under Rule 5-701, or whether the "expert" basis of the opinion will require compliance with Rule 5-702 and admission as expert testimony</u>.

385 Md. at 718. (Emphasis supplied.)

There is in that situation an analytic speed bump that can be troubling when we are not expecting it. The word "witness" may be a monolith, but the things that the monolithic witness may do are pluralistic. To be entitled to render two distinct types of opinion necessarily entails the successful passing of two distinct types of qualifying examination.

Although such polymaths do exist, the successful passing of the bar examination, e.g., does not <u>ipso</u> <u>facto</u> entitle one to practice dentistry. A lawyer, however, if so inclined, is free to take the dental boards. A lay witness, if so inclined, is free to aspire to status as an expert witness. Two types of opinion rendering, however, necessarily contemplate the satisfying of two modes of qualification. To qualify, via personal perception, to render a lay opinion does not exempt one from having to qualify, via "knowledge, skill, experience, training or education," in order to render an expert opinion. Two very different missions require two very different sets of skills. The "witness" may be in the singular but the types of opinion to be rendered and, hence, the qualifying requirements are in the plural. This, in

a nutshell, is the salutary clarification that <u>Ragland v. State</u> has brought to the law of opinion testimony.

The value of <u>Ragland v. State</u> is not that it has changed the law respecting opinion testimony. It is, rather, that it has clarified the law with respect to opinion testimony. That does not diminish its value, for the law respecting opinion testimony was badly in need of clarification, in Maryland and elsewhere. As we have been laboring herein to establish, the focus should always have been on the difference between a lay opinion and an expert opinion and not on the difference between a qualified witness and an unqualified witness. Qualified to do what? For a witness merely to qualify to give one type of opinion does not automatically qualify that witness to give the other. A witness who is qualified, but only to do something else, is, for present purposes, unqualified. In using language carelessly, it is all too easy to conclude that a "qualified witness" for one purpose is a "qualified witness" generally. A qualified plumber, however, is obviously not a qualified neurosurgeon. The semantic slippage is in using the adjective "qualified" promiscuously. The linguistic sin is in letting the adjective stand alone.

That was always logically implicit. Perhaps, however, it was too deeply and subtly implicit. What the amendment to Federal Rule of Evidence 701 did in 2000 and what <u>Ragland</u> did in 2005 in recognizing that amendment as binding in Maryland was to make expressly explicit what had theretofore always been only logically implicit.

How then did this clarification come about? As the Court of Appeals had recognized in <u>Robinson v. State</u>, 348 Md. 104, 118, 702 A.2d 741 (1997), Maryland Rule 5-701 was

10

at that time, except for minor stylistic changes, "identical to Federal Rule of Evidence 701."

Ragland, 385 Md. at 720, further observed:

> Because of this identity between the two rules, judicial decisions construing Fed.R.Evid. 701 often provide persuasive authority for the interpretation of Md. Rule 5-701.

(Emphasis supplied.) See also Perry v. State, 381 Md. 138, 145-146, 848 A.2d 631 (2004);

Beatty v. Trailmaster, 330 Md. 726, 738 n. 8, 625 A.2d 1005 (1993).

The federal caselaw, prior to 2000, was not entirely free of confusion. One view of the qualification required in order for a witness to testify to an opinion was that the type of opinion, expert or lay, and the antecedent qualification necessary to render such an opinion, expert or lay, had to coincide. That view was generally referred to as the "narrow view." That view, coincidentally, is clearly the position taken by Maryland today, post Ragland, and the position that, we are arguing, was always logically implicit. Judge Raker's opinion in Ragland described that view.

> A review of the federal cases interpreting the relevant federal rules reveals that the question of whether a particular witness must be designated as an expert and qualified as such in order to testify about a particular subject has been the subject of debate and disagreement among the federal courts. The more narrow view required that a witness whose testimony could be admitted as expert testimony under Federal Rule 702 must be qualified and received as an expert before the testimony may be admitted. See Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir.2000) (holding that Fed.R.Evid. 701 does not permit a lay witness to testify about matters that are predicated necessarily on "some specialized knowledge or skill or education that is not in the possession of the jurors"); Randolph v. Collectramatic, 590 F.2d 844, 846 (10th Cir.1979) (holding that Fed.R.Evid. 701 does not permit a lay witness to express an opinion as to matters that are beyond the realm of common experience and that require the special skill and knowledge of an expert witness). The rationale underlying this narrow approach is that lay witnesses may testify regarding their direct perceptions of events but that opinions or inferences that rely on scientific, technical, or

11

> specialized knowledge must be excluded unless the witness is qualified as an expert.

385 Md. at 720-21. (Emphasis supplied.)

There was also abroad prior to 2000, however, another point of view, generally referred to as the "more liberal" or "broad" view. It held that as long as the witness was qualified to give an opinion, typically a lay opinion, that witness was thereby authorized to give an expert opinion. One qualification as an opinion giver fit all sizes. This was an easy conclusion to arrive at by those who did not think too precisely. The Ragland opinion also described this "broad" approach.

> The more liberal or broad view holds that lay witness testimony may include opinions predicated on specialized knowledge or training so long as the testimony is rationally based on the personal perception of the witness.

385 Md. at 721-22.

Congress eliminated this pocket of uncertainty in 2000 by amending Federal Rule of Evidence 701 by expressly adding to the rule the provision that a witness "not testifying as an expert" was not qualified to give an opinion "based on scientific, technical, or other specified knowledge within the scope of Rule 702." Judge Raker's opinion in Ragland described the process.

> The issue was settled in 2000, when Congress amended Fed.R.Evid. 701 to address expressly the concerns and debate about the meaning of the rules. Before the amendment, the texts of Fed.R.Evid. 701 and 702 did not address the question of whether lay witnesses could express opinions on those subjects that would require specialized knowledge or training. Following the 2000 amendment, Fed.R.Evid. 701 expressly states that lay witnesses may not offer testimony that is "based on scientific, technical or other specialized knowledge within the scope of Rule 702." The Advisory Committee's note to Rule 701 states that "Rule 701 has been amended to eliminate the risk that

12

the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."

385 Md. at 722. (Emphasis supplied.)

That the 2000 amendment to Federal Rule of Evidence 701 simply made explicit what we are saying has always been implicit was made very clear by the Advisory Committee's note to Rule 702.

> The amendment does not distinguish between expert and lay *witnesses,* but rather between expert and lay *testimony.* Certainly it is possible for the same witness to provide both lay and expert testimony in a single case. The amendment makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal rules.

192 F.R.D. 340, 416-17 (2000). (Emphasis supplied.)

The Court of Appeals in Ragland similarly noted that the 2000 amendment to the federal rule did not represent a change but only a clarification.

> Courts that have considered the question of whether the 2000 amendment was substantive in nature have concluded that the 2000 amendment merely clarified the correct interpretation of Federal Rule 701. See, e.g., United States v. Garcia, 291 F.3d 127, 139 n. 8 (2d Cir.2002) (noting the amendment "does not substantively change Rule 701. Indeed, the amendment serves more to prohibit the inappropriate admission of expert opinion under Rule 701 than to change the substantive requirements of the admissibility of lay opinion"); People v. Stewart, 55 P.3d 107, 123 n. 10 (Colo.2002) (en banc) (noting the amendment was added to eliminate confusion between Rules 701 and 702 and to clarify the distinction between expert and lay testimony). The Advisory Committee's note suggests that the use of Rule 701 to admit opinions based on specialized knowledge was "expedient," and analogizes witnesses who gave such opinions to the proverbial wolf in sheep's clothing. The amendment was necessary, according to the Committee, to "eliminate the risk that the reliability requirements set forth in Rule 702 [would] be evaded" under some courts' interpretations of Rule 701.

13

385 Md. at 723. (Emphasis supplied.)

The <u>Ragland</u> opinion concluded:

<u>We think the better view in interpreting the rule regarding opinion testimony is the more narrow one, and the view as expressed in the amended Fed.R.Evid. 701</u>…. Accordingly, <u>we will follow the approach as reflected in the 2000 amendment to Fed.R.Evid. 701</u> and hold that <u>Md. Rules 5-701 and 5-702 prohibit the admission as "lay opinion" of testimony based upon specialized knowledge, skill, experience, training or education</u>.

385 Md. at 725. (Emphasis supplied.)

The federal amendment of 2000 added new words to Federal Rule of Evidence 701. Maryland Rule 5-701 has remained unchanged. No change, however, was necessary to keep the Maryland Rule and the Federal Rule on a parallel course. On neither side of the jurisdictional line was there any actual change in the law. On each side there were simply indistinguishable clarifications. On the federal side, the clarification was manifested by the amendment to the wording of the rule itself. On the Maryland side, a similar clarification was manifested by the interpretive mechanism of the Court of Appeals, speaking through <u>Ragland v. State</u>. On both sides, the clarifications made explicit what had always been, or should have been, logically implicit. These invaluable clarifications, however, do now permit us to get to the desired juridical destination far more quickly and far more easily than we otherwise could have done.

Where then does this leave the appellant Cheeks with respect to his contention based on <u>Ragland v. State</u>? It would seem that he would be entitled, at the very least, to a hypothetical moral victory. If, <u>arguendo</u>, we assume, as he alleges in his brief, that the State was offering Lieutenant Zimmerman as an expert witness but simply neglected to request

14

that he be formally admitted as such, we might have a clear violation of <u>Ragland</u>. That assumption, however, would depend upon the companion assumption that Judge Handy also thought that Lieutenant Zimmerman was being offered as an expert witness but then completely failed to realize that would permit both parties to voir dire the lieutenant as to his qualification as an expert and would further require her to make an express ruling in that regard. Cheeks's hypothetical would require us to conclude that Judge Handy 1) had deemed the fleeting testimony about the susceptibility of certain surfaces to the lifting of fingerprints to be a subject calling for expert testimony; 2) had concluded that the State had adequately established Lieutenant Zimmerman to be such an expert; 3) but had not offered Cheeks any opportunity to counter such proof; 4) and had actually herself made a ruling that Lieutenant Zimmerman was admitted as such an expert witness. It is equally improbable that, if all of these antecedent improbabilities had occurred, the unargued, unexplained, and unadorned ruling would have provoked not a syllable of protest and that the trial should have gone one without a hiccup.

The fleeting ruling has taken on a significance in its afterlife that it never had at trial. Only such a concatenation of far-fetched assumptions could support Cheeks's contention that this was why and how Judge Handy erroneously overruled Cheeks's objection. If all of these assumptions were, <u>arguendo</u>, true, however, Cheeks might well be entitled to relief. We cannot, however, realistically deem such a perfect storm of improbabilities to have come together. Such an <u>arguendo</u> hypothetical remains no more than a hypothetical.

## **Johnson v. State**

This is especially true if another and better explanation for this quick and unadorned ruling is available. In our judgment, such an alternate explanation is available. As a matter of fact, it is infinitely more likely to have been the context for the otherwise quick and cryptic "Objection. Overruled." exchange. As a legal rationale for that exchange, moreover, it is a far more tenable explanation for an infinitely more likely trial scenario.

Even if, as we have established at length, Ragland v. State is now the accepted final word on the subject of the difference between expert opinions and lay opinions and the respective qualifications for being able to render either of those, that is still but one part of the law of opinion testimony. A separate but very important aspect of expert opinion law is that of what subjects or issues actually require expert opinion testimony and which do not. The recent opinion of Judge McDonald for the Court of Appeals in Johnson v. State, 457 Md. 513, 179 A.3d 984 (2018), has contributed massively to our understanding of this separate branch of expert opinion law.

In a nutshell, a failure to follow the directions of Rule 5-702 is meaningless if Rule 5-702 does not apply. A failure of Lieutenant Zimmerman to qualify as an expert is meaningless if his testimony was not required to be an expert opinion. That may be the Achilles heel of the appellant Cheeks on this contention in this case. Johnson v. State requires us to inquire as to whether a particular trial issue is even of the type contemplated by Rule 5-702. Is the testimony the sort of thing that necessarily "will assist [the jury] to understand the evidence" or is it "a matter of which the juror would be aware by virtue of common knowledge?" Judge McDonald posed the dichotomy, 457 Md. at 530:

16

Expert testimony is *required* "only when the subject of the inference ... is so particularly related to some science or profession that is beyond the ken of the average layman [; it] is not required on matters of which the jurors would be aware by virtue of common knowledge."

(Emphasis supplied.)

In Johnson v. State, the Court of Appeals was dealing with a global positioning device, a subject significantly more arcane than the lifting of fingerprints. Yet as Judge McDonald articulately expressed, there can be a broad lay understanding well short of a Ph.D degree.

> Although a user may not understand precisely how a GPS device works, the same is true for other commonly used devices such as clocks, scales, and thermometers. The general public has a common sense understanding of what information the device conveys -- time, weight, temperature -- and of the margin of error to which such devices are ordinarily subject: a colleague's watch may tell time a minute faster or slower than one's own; the scale at the gym may display a different weight than the scale at home; and a thermometer that estimates child's temperature may give a slightly different answer in a second reading.

457 Md. at 531. (Emphasis supplied.) And so too with fingerprints.

The Court of Appeals in Johnson did not hesitate to hold that, even without the benefit of expert opinion pursuant to Rule 5-702, a lay opinion about GPS tracking was admissible.

> In our view, the times and locations reflected in GPS data in a business record do not necessarily require expert testimony to be admissible… Courts in other jurisdictions have admitted evidence derived from GPS tracking devices over objections to the lack of technical expertise of the sponsoring witness. For example, courts have admitted tracking reports from GPS devices concealed in currency stolen from banks, data reports from GPS monitoring devices worn by probationers, and data on a GPS device seized from drug smuggling boat. We reject a categorical rule that expert testimony is required whenever location and duration information derived from a GPS device is offered into evidence. Of course, the party opposing admission is

17

free to cross-examine the sponsoring witness concerning any defects in the data, as happened in this case, or to present its own expert to contest the accuracy of a particular device.

457 Md. at 532-33. (Emphasis supplied.)

As Johnson further made clear, moreover, Cheeks, if unhappy about Officer Zimmerman's reason for not seeking fingerprints in this case was free, of course, to cross-examine the officer closely and/or to produce his own expert. On this contention, we would admonish Cheeks with the words of Johnson, 457 Md. at 532:

Expert testimony about how a clock works is not necessary every time an employee's timesheet is offered into evidence.

(Emphasis supplied.)

Let us again remind ourselves that the critical testimony now at issue is Lieutenant Zimmerman's opinion that:

**SURFACES THAT ARE COARSE OR RUBBERIZED OR UNEVEN TYPICALLY DO NOT YIELD LATENT FINGERPRINTS.**

By far the most likely explanation for the summary overruling of Cheeks's objection to the fingerprinting testimony was an instinctive judgment by Judge Handy that the very subject was not one calling for the subtleties and formalities of expert opinion law. That "gut" reaction would simply have been that the subject was not "beyond the ken of the average layman" but that it was one "of which jurors would be aware by virtue of common knowledge." We would not find ourselves in disagreement with such an instinctive judgment.

Our coincidental agreement or disagreement, however, is ultimately irrelevant. Are fundamental aspects of fingerprinting truly "beyond the ken of the average layman" or are

18

they "matters of which the jurors would be aware by virtue of common knowledge"? Or, more significantly, is this a close call that might reasonably go either way? And if so, how then should we, on appellate review, assess a trial judge's close calls? The handling of close calls, both the making of them and the appellate reviewing of them, is a fascinating small enclave of law all of its own.

## Who Gets To Make The Close Calls?

There are, of course, innumerable instances in life where common experience and science meet. Ideally, they should blend together within a comfortable median strip and not clash along a border rigidly set down by a surveying team. Along such a border, there should exist a garden path and not the Maginot Line. A witness should be able to stroll back and forth in the grass without worrying about stepping on a third rail. At the very least, the ostensibly broad discretion of the trial judge should be able to reach back and forth without worrying about a third rail. If a witness should testify, "When I walked outside, it was raining," that need not convoke a conclave of meteorological experts. A mere dab of popular science need not incur the full fury of academia.

We must remind ourselves that in law, as in life, things are not always neatly binary. Life and law, in their infinite variety, frequently must grapple with overlapping. The susceptibility of various surfaces to the lifting of readable fingerprints may well lie in that adjudicative twilight zone. It is here that one expects to find the close calls. The necessity of making close calls in a twilight zone is grist, moreover, for the discretionary mill.

Even if, arguendo, we did find ourselves in initial disagreement with Judge Handy, that would not call for a different result in this case. Such a call in the first instance is one

quintessentially entrusted to the broad discretion of the trial judge and an appellate court will not substitute its judgment for that of the trial judge absent a clear abuse of that discretion. In upholding a trial court judge's exercise of discretion, the appellate court is scrupulously and broadly deferential.

In what has come to be the accepted Ur-text for appellate review of the exercise of discretion, Chief Judge Alan Wilner (later judge on the Court of Appeals) said for this Court in North v. North, 102 Md.App. 1, 14, 648 A.2d 1025 (1994):

> There is a certain commonality in all of these definitions, to the extent that they express the notion that **A RULING REVIEWED UNDER AN ABUSE OF DISCRETION STANDARD WILL NOT BE REVERSED SIMPLY BECAUSE THE APPELLATE COURT WOULD NOT HAVE MADE THE SAME RULING**. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of "untenable grounds," "violative of fact and logic," and "against the logic and effect of facts and inferences before the court."

(Emphasis supplied.) See also King v. State, 407 Md. 682, 697, 967 A.2d 790 (2009); Nash v. State, 439 Md. 53, 67, 94 A.3d 23 (2014).

Indeed, the essential reason for deferential review was well expressed for the Court of Appeals by Judge O'Donnell in Wilhelm v. State, 272 Md. 404, 413, 326 A.2d 707 (1974).

> The conduct of the trial must of necessity rest largely in the control and discretion of the presiding judge and an appellate court should in no case interfere with that judgment unless there has been an abuse of discretion by the trial judge of a character likely to have injured the complaining party.

20

(Emphasis supplied.) See also Gross v. State, 229 Md.App. 24, 32, 142 A.3d 692 (2016)("Broad discretion is vested in the trial court with regard to expert testimony, and that discretion will not be disturbed on appeal absent an error of law or fact, a serious mistake, or clear abuse of discretion."); State v. Robinson, 348 Md. 104, 121, 702 A.2d 741 (1997); Kelly v. State, 392 Md. 511, 530, 898 A.2d 419 (2005); Hopkins v. State, 352 Md. 146, 158, 721 A.2d 231 (1998).

In dealing not with absolute certainties but in the inevitably more ambiguous twilight zone that stretches, sometimes widely, between opposing certainties, decision-making is heavily dependent on the eye of the beholder. For purposes of appellate review, that beholder is the trial judge who must make the split-second rulings and calls on the field in the middle of the action. It is always prudent for the appellate court to remember that it was not on the field, but is sitting back quietly in the league office a hundred miles away and six months after the fact. Deference marinates in distance. With prudent deference, we hold that Judge Handy's disinclination to apply expert opinion law to this arguably non-expert issue was not an abuse of her broad discretion.[2]

---

[2]    If an appellate panel were to disagree within itself about a trial judge's exercise of discretion, that might create a delicate situation for the panel pursuant to North v. North's definition of "abuse", 102 Md.App. at 14. For one panelist to charge other panelists, those agreeing with the trial judge, with defending a position that was "beyond the fringe of what that court deems minimally acceptable" might seem to be a breach of collegial felicity.

More significantly, however, for one panelist to charge other panelists, those agreeing with the trial judge, with defending a position "well-removed from any center mark imagined by the reviewing court" would seem to create an oxymoron. How could those other panelists express a position "well-removed from any center mark" that they could possibly imagine? How could they espouse what they cannot imagine? Can a trial

21

**An <u>Arguendo</u> Hypothetical Times Two:**
**Harmless Error**

Even if, purely <u>arguendo</u>, the trial judge's overruling of the objection to the officer's explanation for non-fingerprinting could be deemed by the appellate court to be an error, and even if, doubly <u>arguendo</u>, that error could be deemed an abuse of discretion, we would still affirm Cheeks's conviction. <u>Dorsey v. State</u>, 276 Md. 638, 659, 350 A.2d 665 (1976), held that even an established error may be deemed harmless if "a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict."

Realistically, this case did not turn on the existence or non-existence of a fingerprint. This case also did not turn on the thoroughness of the investigation made by the police. Officer Zimmerman's opinion about certain surfaces not yielding fingerprints was not, as in <u>Ragland v. State</u>, an element of the crime. It dealt with nothing more than a fringe issue on the peripheral rim of the trial. The entire expert opinion appellate controversy concerns only a collateral trial issue, and a small-bore issue at that.

The undisputed fact was that no fingerprint of the .32 revolver was taken. The evidence, however, put the gun in the hands of Cheeks as he came out of the window and before he dropped it to the alley floor. The .357 Magnum carried by the first fugitive out

---

judge's position which enjoys some appellate support truly be characterized as being "beyond the fringe of what the court deems minimally acceptable"? In the words of Meredith Willson's <u>The Music Man</u>, such an intra-panel disagreement might even be characterized as "A Dissent with a capital D, and that rhymes with T, and that stands for Trouble."

of the window, Mack, was recovered from the field through which Mack had fled. The .32 revolver was seen in Cheeks's possession before the third fugitive ever came out of the window. The connection between Cheeks and the .32 revolver was never a realistic matter of controversy.

An absolutely major factor in deciding whether a hypothetical error would or would not have been harmless is the purpose for which the challenged opinion evidence was offered and, therefore the likely impact that the evidence may have had. On this issue, the contrast between this case and Ragland v. State could not be greater. In Ragland, the opinions of two officers, based on extensive background study and training, went to the very core of the criminal charge itself. Ragland was being tried for having participated in an exchange of narcotics. Without the opinions of the officers, there would not have been even a prima facie case of such participation. Based upon their training and special knowledge, however, the officers were able to opine that Ragland's otherwise ambiguous behavior actually constituted the drug transaction itself. The challenged opinions did not merely influence the verdict. They, indeed, made the verdict possible. If error, that would be harmful error per se. In circus terms, those police opinions commanded the absolute center ring of the production.

In similar circus terminology, the opinion being challenged by Cheeks in this case was an inconsequential event in a carnival tent on the far periphery of the circus grounds. The core issue in this case, of course, was whether Cheeks had been in possession of the .32 caliber handgun recovered from the alley floor. Notwithstanding direct testimony that he had been, the defense still might have liked to make the point that there was no physical

or scientific evidence corroborating that testimony and linking him to the gun (The Classic CSI Defense). The issue of whether the police had conducted a thorough investigation would be a tangential consideration, but one bearing on the more directly pertinent issue. The sub-issue of whether the gun had been dusted for prints or whether Cheeks himself had been fingerprinted would bear on the thoroughness of the investigation. If the lead investigator had failed to request a search for fingerprints, some interest might then arise in why he had not done so. Step by imperceptible step, however, the inquiry would be getting farther away from the core question of whether the crime itself had been committed. The hypothetical error in this case would not have gone to the case's core issue. It did not even go to a major tangent. Its impact, at most, would have been on a tangent of a tangent. Our point is that there would have been significant attenuation. The more the attenuation, of course, the greater the likelihood that the hypothetical error would have been harmless.

The jury in this case was not chomping at the bit for an opportunity to punish the police for not being more diligent in their investigative thoroughness. Whether or not Officer Zimmerman was permitted to give his reason for not having had the weapon fingerprinted was, we declare beyond any reasonable doubt, of absolutely no consequence to the jury's decision in this case. The error, if any, was harmless

## Enhanced Sentencing and Required Notice

Cheeks's second contention is that he received an enhanced sentence without having received the required notice that should be provided antecedent to his being tried and/or sentenced. Maryland's statutory law criminalizing the possession and/or use of handguns and other firearms is absolutely labyrinthine and calls for careful navigation of a tangled

thicket. Cheeks was found guilty of all three offenses charged against him in his indictment. He was sentenced for all three convictions. Only one of them, however, involved enhancement. The actual sentencing was very brief.

> THE COURT: So under Count I, possession of a regulated firearm, being a prohibitive person, your sentence is 15 years, the first five without the possibility of parole. Count II, wear, carry, and transporting a handgun, five years to run consecutive, and Count III, possession of ammunition, one year to run concurrent to Count II.

The heavy sentencing was on the first count and did not involve enhancement. The basic crime is spelled out in Maryland Code, Public Safety Article, Sect. 5-133 and prohibits the possession of a regulated firearm by a person deemed to be unqualified to possess a firearm by virtue of various circumstances, including prominently a conviction for a crime of violence. The basic penalty for a violation, available for a first violation of the statute or for any subsequent violation, is provided by Subsect. 5-133(c)(2):

> (i)    Subject to paragraph (3) of this subsection, a person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment for not less than 5 years and not exceeding 15 years.
>
> (ii)    The court may not suspend any part of the mandatory minimum sentence of 5 years.
>
> (iii)    Except as otherwise provided in Sect. 4-305 of the Correctional Services Article, the person is not eligible for parole during the mandatory minimum sentence.

This was a straightforward sentencing provision that did not involve enhancement. By the same token, the sentence on the third count did not involve any enhancement. The sentence of one year was for a violation of Maryland Code, Public Safety Article, Sect. 5-133.1, which prohibits the possession of ammunition by a person who is prohibited from

possessing a firearm. Subsection (c) is the basic penalty provision and not an enhanced penalty for recidivists.

It was only Cheeks's sentence on the second count that entailed any penalty enhancement. The conviction was for a violation of Maryland Code, Criminal Law Article, Sect. 4-203, prohibiting the wearing, carrying, or transporting of a handgun. The basic unenhanced penalty provision is for "imprisonment for not less than 30 days and not exceeding 3 years." For one having been previously convicted, however, subsection (c)(1) provides for "imprisonment for not less than 1 year and not exceeding 10 years." Cheeks's sentence of five years on Count Two was, therefore, the product of permissive enhancement. By virtue of its having been made consecutive to the 15-year sentence of Count One, moreover, it was more than merely academic.

When a defendant is being subjected to an enhanced penalty, Maryland Rule 4-245 provides that the State Attorney must give the defendant notice of that possibility. This notice is two-pronged. Rule 4-245(b) provides for notice "at least 15 days before trial in the circuit court" for additional penalties which are permissive.

> (b) Required Notice of Additional Penalties. <u>When the law permits but does not mandate additional penalties</u> because of a specified previous conviction, the court shall not sentence the defendant as a subsequent offender unless the State's Attorney serves <u>notice of the alleged prior conviction</u> on the defendant or counsel before the acceptance of a plea of guilty or nolo contendere or <u>at least 15 days before trial in circuit court</u> or five days before trial in District Court, whichever is earlier.

(Emphasis supplied.)

Rule 4-245(c) provides for notice "at least 15 days before sentencing" for additional penalties which are mandatory.

26

(c) Required Notice of Mandatory Penalties. <u>When the law prescribes a mandatory sentence</u> because of a specified previous conviction, the State's Attorney shall serve a <u>notice of the alleged prior conviction</u> on the defendant or counsel <u>at least 15 days before sentencing</u> in circuit court or five days before sentencing in District Court. If the State's Attorney fails to give timely notice, the court shall postpone sentencing at least 15 days unless the defendant waives the notice requirement.

(Emphasis supplied.)

In terms of Cheeks's sentence on the second count, the provision that the sentence involves "imprisonment for not less than 1 year" was mandatory and could have engaged the gears of Rule 4-245(c). The actual five-year sentence was permissive and should, therefore, have engaged the gears of Rule 4-245(b).

With respect to the mandatory penalty enhancement of Rule 4-245(c), the State gave untimely notice. The notice was given only 13 days before sentencing, rather than the requisite 15 days before sentencing. With respect to the permissive enhancement of Rule 4-245(b), by contrast, the State gave no notice at all until three weeks after the trial in the circuit court had been concluded.

The appellant Cheeks, however, conveniently limits our necessary review to notice of permissive enhancement pursuant to Rule 4-245(b). As his brief announces, "Rule 4-245(b) is the applicable provision." It is undisputed that Cheeks's sentence of five years was a permitted enhancement of two years over the three-year maximum sentence permitted for an unenhanced sentence. It is also undisputed that Cheeks was given before trial no notice of the State's intention to seek an enhanced sentence. Ordinarily, that would clearly be reversible error.

27

On this issue, however, the overarching procedural reality is that Cheeks's objection has not remotely been preserved for appellate review. At the sentencing in the case, there was at least some discussion, even if not a formal objection, of a Rule 4-245(c) notice violation. There was, by contrast, not the remotest mention of or allusion to any possible Rule 4-245(b) violation. This would ordinarily foreclose any further consideration of the contention.

**An Illegal Sentence: In The Simple Sense And In The Pluperfect Sense**

In seeking to shield his second contention from the otherwise debilitating effects of non-preservation, Cheeks plays the trump card of Maryland Rule 4-345(a). That rule provides: "(a) Illegal Sentence. The court may correct an illegal sentence at any time." He claims that his lack of notice makes his enhanced sentence an illegal sentence.

Rule 4-345(a) is, indeed, sometimes a trump card that can effectively override non-preservation. As Judge Wilner wrote for the Court of Appeals in Cheney v. State, 397 Md. 460, 466, 918 A.2d 506 (2007):

> Maryland Rule 4-345(a) permits a court to "correct an illegal sentence at any time." If a sentence is "illegal" within the meaning of that section of the rule, the defendant may file a motion in the trial court to "correct" it, notwithstanding that (1) no objection was made when the sentence was imposed, (2) the defendant purported to consent to it, or (3) the sentence was not challenged in a timely-filed direct appeal.

(Emphasis supplied.)

So sweeping an antidote, however, must be prescribed only with extreme caution. A full body of supporting case law surrounds Rule 4-345(a) and makes it perspicaciously clear that not all flawed sentences may be corrected at any time. It is only those sentences

28

that are "inherently illegal" that are so vulnerable to open-ended corrections. In <u>Carlini v.</u>

<u>State</u>, 215 Md. App. 415, 419, 81 A.3d 560 (2013), this Court explained:

> <u>What is an illegal sentence</u>? <u>That all depends upon what one means by "an illegal sentence."</u> <u>There are countless illegal sentences in the simple sense</u>. They are sentences that may readily be reversed, vacated, corrected or modified on direct appeal, or even on limited post-conviction review, for a wide variety of procedural glitches and missteps in the sentencing process. <u>Challenges to such venial illegalities</u>, however, <u>are vulnerable to such common pleading infirmities as non-preservation and limitations</u>. There is a point, after all, beyond which we decline to revisit modest infractions. <u>There are, by contrast, illegal sentences in the pluperfect sense</u>. Such illegal sentences are subject to open-ended collateral review. Although both phenomena may casually be referred to as illegal sentences, <u>there is a critically dispositive difference between a procedurally illegal sentencing process and an inherently illegal sentence itself</u>. **IT IS ONLY THE LATTER THAT IS GRIST FOR THE MILL OF MARYLAND RULE 4–345(a):**
> > (a) *Illegal Sentence*. The court may correct an illegal sentence at any time.

(Emphasis supplied.)

These two very distinct illegalities must not be conflated. It was of this essentially

linguistic problem that this Court spoke in <u>Matthews v. State</u>, 197 Md. App. 365, 367, 13

A.3d 834 (2011), <u>rev'd on other grounds</u>, 424 Md. 503, 36 A.3d 499 (2012).

> What seems at first to be a legal problem frequently turns out to be a linguistic or a semantic problem. On this appeal, <u>we come face to face with the enigma that an illegal sentence is not always an illegal sentence</u>. <u>We do not mean this as doubletalk</u>. <u>In the context of direct appellate review, there are a wide variety of reasons why a sentence</u>, or a sentencing procedure, <u>may be so seriously flawed as to give rise to the appellate reversal or vacating of the sentence</u>. In this context, <u>such flaws are</u>, and are <u>regularly referred to as, illegal sentences</u>. There are, however, procedural rules regulating the form that challenges to such sentences may take and imposing strict limitations on when such challenges may be made. <u>There is also</u>, by dramatic contrast, <u>a very different context in which a sentence may be challenged at any time, subject to no filing deadline of any sort</u>.

(Emphasis supplied.)

For the appellant Cheeks to tell us then, or even to persuade us, that his enhanced sentence without proper notice was an "illegal sentence" is no answer. To tell us that the enhanced sentence was an "illegal sentence" tells us nothing. When some "illegal sentences" will override non-preservation and other "illegal sentences" will not, we obviously need some further fine-tuning.

The opinion of Judge Getty for the Court of Appeals in Bailey v. State, 464 Md. 685, 212 A.3d 912 (2019), has given us the necessary fine-tuning. In Bailey, the failure to give adequate notice of a permissive sentence enhancement, as in this case, was in violation of Rule 4-245(b). Notice of the State's intention was only given 10 days in advance of trial in the circuit court, rather than the requisite 15 days in advance. As in the present case, Bailey did not object to the enhanced sentence and nothing was preserved for appellate review. The Court of Appeals posed the question before it:

> Now we consider whether this belated notice resulted in an illegal sentence requiring correction, or instead, whether the late notice was a procedural deficiency subject to harmless error review.

464 Md. at 691. (Emphasis supplied.)

Bailey argued that non-preservation was not a foreclosing issue because, pursuant to Rule 4-345(a), an illegal sentence may be corrected at any time. The Court of Appeals first addressed the question of whether the enhanced sentence was an "illegal sentence" within the contemplation of Rule 4-345(a).

> As a threshold question, we must determine whether the circuit court's application of the enhancement after the State's belated notice was an imposition of an "illegal" sentence under Maryland Rule 4-345(a). Pursuant to Maryland Rule 4-345(a), "[t]he court may correct an illegal sentence at any time." If the sentence is illegal, it is not subject to preservation requirements and may be corrected even if: "(1) no objection was made when

30

the sentence was imposed, (2) the defendant purported to consent to it, or (3) the sentence was not challenged in a timely-filed direct appeal." *Chaney v. State*, 397 Md. 460, 466, 918 A.2d 506 (2007). In this case, Mr. Bailey never objected to the imposition of the enhancement in the circuit court. Therefore, in order for Mr. Bailey to secure review of his unpreserved objection, this Court must determine [whether] the sentence was illegal.

464 Md. at 696. (Emphasis supplied.)

Reviewing the bountiful caselaw, the Court of Appeals concluded that the failure to give timely notice was a procedural flaw in the sentencing procedure but that it did not represent an inherent illegality in the sentence itself. Review pursuant to Rule 4-345(a) was, therefore, not appropriate.

Based on the review of our precedent, the imposition of a sentence enhancement despite the State's failure to timely serve the notice for the enhanced sentence does not qualify as an illegal sentence pursuant to Maryland Rule 4-345(a). We decline to expand our prior interpretation of an "illegal" sentence to include cases such as this one. We have previously stated that "[t]he scope of this privilege, allowing collateral and belated attacks on the sentence and excluding waiver as a bar to relief, is narrow." *Chaney v. State*, 397 Md. 460, 466, 918 A.2d 506, (2007) (emphasis omitted). "In other words, a motion to correct an illegal sentence is not an alternative method of obtaining belated appellate review of the proceedings that led to the imposition of judgment and sentence in a criminal case." *State v. Wilkins*, 393 Md. 269, 273, 900 A.2d 765 (2006). The State's imperfect compliance created a procedural deficiency in the sentence but not a sentence in which the circuit court did not have statutory power to impose. Mr. Bailey's sentence was appropriate for a defendant whose sentence was enhanced as a subsequent offender. Review pursuant to Maryland Rule 4-345(a) is not appropriate in this matter.

464 Md. at 697. (Emphasis supplied.)

The lack of timely notice, or of any notice at all, therefore, is a procedural flaw in the sentencing process. A failure of antecedent notice is no more an inherent illegality in the sentence itself than would be the insufficiency of the evidence to support the conviction or an erroneous jury instruction or the deprivation of a constitutional trial protection. Maryland Rule 4-345(a) does not apply to this case. The trump card proffered by Cheeks

31

will not work its overriding magic. The traditional preservation requirement still abides. Judge Getty's opinion in Bailey was emphatically clear in that regard.

> <u>Mr. Bailey is precluded from challenging his sentence pursuant to Maryland Rule 4-345(a)</u> and he failed to object to the sentencing enhancement as a subsequent offender after the State's deficient notice. Maryland Rule 8-131(a) prescribes that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." <u>Therefore, defendants are required to object and raise any issue so that it may be decided by the trial court</u>. *Nalls v. State*, 437 Md. 674, 691, 89 A.3d 1126 (2014). <u>Without an objection, the issue is typically deemed waived</u>.

464 Md. at 697-98. (Emphasis supplied.)

In this case, the issue of the State's failure to give notice of its intention to push for enhanced permissive sentencing pursuant to Rule 4-245(b) has not been preserved for appellate review. That, however, seldom ends the matter.

### Non-Preservation Squared

It has become a commonplace for defendants who have failed to preserve for appellate review a desirable contention to turn to Rule 8-131(a) and to ask the appellate court, in its discretion, to notice plain error. Although it is "a rare, rare phenomenon" for an appellate court to grant such a request, <u>Morris v. State</u>, 153 Md. App. 480, 507, 837 A.2d 248 (2003), <u>cert. denied</u>, 380 Md. 618, 846 A.2d 402 (2004), it has become epidemically routine for defendants to make such a request.

Our present circumstance, however, is even more unusual. The appellant Cheeks has not even asked us to take "plain error" notice of the State's failure to give Rule 4-245(b) notice. If it is "a rare, rare phenomenon" for an appellate court to take "plain error"

notice when asked to do so, it would be infinitely rarer still for an appellate court to take "plain error" notice when not asked to do so. This will not, nostra sponte, be such an infinitely rarer occasion.[3] A case of simple non-preservation has become a case of non-preservation squared.

Thus, unplugged from any emergency life support by non-preservation, this contention about the lack of required notice for enhanced punishment would appear to have utterly flat-lined.

## A Familiar Ace In The Hole: Incompetence of Counsel

For defendants who have failed to batten down their possible contentions with timely objections, there may be available another port in the storm. If trial counsel has failed to preserve a point for appellate review, it has become almost routine for a defendant to claim to have been unconstitutionally denied the right to the effective assistance of counsel. This has become an almost automatic Side B to a request for "plain error" review.

For the defendant, a claim of incompetence of counsel, of course, can be an appellate "Get Out Of Jail Free" card. It effectively asserts, "Any apparent waiver or forfeiture must be attributed to my lawyer and not to me." A big difference between a "plain error" request and a claim of incompetence of counsel is that the target in the appellate cross hairs for

---

[3] Simply to foreclose any possible future post-conviction effort to charge appellate counsel with incompetence for failure to request "plain error" review on appeal, we hasten to point out that had such a request been made, it would have been denied. More generally, the odds against the appellate granting of a request to notice plain error are so heavy that it is highly unlikely that such a post-appeal contention would ever succeed. Satisfying the prejudice prong would present a virtually insurmountable problem.

failure adequately to protect the defendant becomes the lawyer, for allegedly inadequate

trial performance, rather than the trial judge, for the failure sua sponte to intervene. As to

which, the defendant is benignly neutral.[4]

In this case, the appellant Cheeks is battling to reach that alternate port in the storm.

He argues:

> Accordingly, defense counsel should have been aware of Rule 4-245(b)'s mandate. Had counsel been aware of this Rule, there was simply *no conceivable* tactical reason not to object, as a successful objection would have limited Mr. Cheeks's exposure under CL Sect. 4-203 to a maximum sentence of three years, rather than the five years that he received.

(Emphasis supplied.)

Turning from the performance prong to the prejudice prong of Strickland v.

Washington, 466 U.S. 668, 104 S. Ct 2052, 80 L.Ed.2d 674 (1984), Cheeks goes on:

> Second, counsel's failure to object was prejudicial. Given that the plain language of the Rule prohibits the court from imposing an additional penalty if the State fails to file timely notice, it was not just "significantly possible," but certain, that the trial judge would not have imposed the penalty if an objection was made.

(Emphasis supplied.)

On this issue as well, however, we choose to rely on Bailey v. State. After

thoroughly reviewing the pre-existing caselaw, Judge Getty's opinion concluded:

> [P]ost-conviction proceedings are preferred with respect to ineffective assistance of counsel claims because the trial record rarely reveals why counsel acted or omitted to act, and such proceedings allow for fact-finding and the introduction of testimony and evidence directly related to allegations of the counsel's ineffectiveness." *Id.* at 560, 836 A.2d 678. This Court determined that "the adversarial process found in a post-conviction generally

---

[4] There is no apparent reason why an appellant cannot raise both claims simultaneously.

is the preferable method" when evaluating an ineffective assistance of counsel claim.

464 Md. at 704. (Emphasis supplied.)

The conclusion of the Court of Appeals in <u>Bailey</u> was sure.

Likewise, in this case, the trial record does not "clearly illuminate" why counsel's actions were ineffective. *See id.* <u>We will not second-guess counsel's actions on direct appeal when there is an opportunity to introduce testimony and evidence directly related to this issue</u>. We decline to make counsel's actions in this matter a *per se* instance of an ineffective assistance of counsel claim. Therefore, <u>a post-conviction proceeding is the appropriate venue for Mr. Bailey's claim</u>.

464 Md. at 705. (Emphasis supplied.)

By the same token, we conclude that Cheeks's claim that he suffered the ineffective assistance of counsel is best handled by way of post-conviction review. So much for the appellant Cheeks.

## Relevance and Minimalism

The admissibility of evidence does not, as the appellant Mack now contends, depend upon necessity. Should a proponent clinch the proof of an issue by offering five absolutely irrefutable eyewitnesses, the testimony of a sixth or a seventh eyewitness would not thereby become inadmissible. The mere satisfaction of the burden of production will not be deemed <u>ipso facto</u> to satisfy the burden of ultimate persuasion lest juries become completely unnecessary. Juries are not at all unnecessary, however, and admissibility is not controlled by some inverse proportion between relevance and running up the score. Minimalism is not required. A strong case need not apologize for itself.

35

The focal point around which this contention revolves is the criminal agency of the appellant Mack. Mack was identified by two witnesses, Sergeant Mercado and Officer Zimmerman. The identification of Mack was by no means a pat hand. Mack was the first fugitive out of the window. He was immediately chased by Lieutenant James, but he got away. Lieutenant James, however, could not identify him. Mack was not seized at the scene or in immediate flight therefrom. There was no physical evidence linking him either to 5404 Midwood Road or to the .357 Magnum found along his path of flight. Evidence of his criminal agency was, therefore, critical.

The first of the two witnesses linking Mack to the precipitous flight from 5404 Midwood Road was Sergeant Mercado. It was Sergeant Mercado who, along with Lieutenant James, was being deployed to cover the rear of the house. Although Sergeant Mercado was primarily involved in chasing the second fugitive to come out of the window, the appellant Cheeks, he did recognize the first of the fugitives as the appellant Mack. Sergeant Mercado's testimony with respect to Mack was brief.

[STATE]: Did you recognize that individual?

[MERCADO]: Yes.

[STATE]: And who was that individual?

[MERCADO]: Martinez Mack.

[STATE]: And do you see that person in the courtroom?

[MERCADO]: Yes.

The sergeant testified that he had known Mack before. Again, the testimony was brief.

36

[STATE]: Now, was this the first time that you'd seen Mr. Mack?

[MERCADO]: No.

[STATE]: Did you know who Mack was before this day?

[MERCADO]: Yes.

With almost casual nonchalance, Mack now insists that the State's case of his criminal identity was irrefutably established at that point and that any further corroboration of Sergeant Mercado's identification was unnecessary window-dressing. He asserts in his brief, "The State's case against Mack should have stood or fallen on Sergeant Mercado's identification and the location of the firearm without imputing the existence of crimes into the trial." (Emphasis supplied.) To be sure, the State had at that point satisfied its burden of production and was no longer at risk of having a judgment of acquittal directed against it as a matter of law. What Mack conveniently forgets, however, is that the State was still very much at risk of not persuading the jury of Mack's criminal agency, unanimously and beyond a reasonable doubt. There was no concession by Mack that it was, indeed, he who was the first fugitive out of the window and who was chased by Lieutenant James. Had Sergeant Mercado's identification not been corroborated, Mack's counsel might well have pounced upon that potential weak point in closing argument. Even if not "hotly contested," proof of Mack's criminal agency was still only half-way home.

The invaluable corroboration of Sergeant Mercado's identification of Mack came through Officer Zimmerman. Officer Zimmerman was not only in charge of the raiding party on March 13, 2018. He had been in charge of the pre-raid surveillance that had been a factor in the application for the "No Knock" warrant. Officer Zimmerman was able to

37

identify Mack as an individual who had been observed on a regular basis going in and out

of the house during the course of that surveillance.

> [STATE]: So, when you say prior surveillance, what do you mean by that?
> [ZIMMERMAN]: So, covert surveillance and then also just being around the areas where he was known to frequent at the time.

On redirect examination, Officer Zimmerman elaborated:

> [STATE]: Officer Zimmerman, when you said <u>you did surveillance of Mack, is that correct</u>?
> [ZIMMERMAN]: <u>Yes</u>.
> [STATE]: <u>Where were you when you did that surveillance</u>?
> [ZIMMERMAN]: <u>I was in a covert location</u>… I was observing, I had a clear view of the 5400 block of Midwood Avenue.
> [STATE]: And when you say that block, are you talking about the front of the block or the rear of the block?
> [ZIMMERMAN]: The front.
> [STATE]: Okay. <u>When you were observing the 5400 block of Midwood Avenue, who did you see that was related to this investigation</u>?
> [ZIMMERMAN]: <u>I observed Mr. Martinez Mack going in and out of the doorway on prior occasions</u>.

(Emphasis supplied.)

The connection of Mack to 5404 Midwood Road solidly corroborated Sergeant

Mercado's fleeting observation of Mack at the time of the raid. That was its probative

value. As evidence of the identity of the man who ran from the scene and was chased by

Lieutenant James on March 13, 2018, the testimony of Officer Zimmerman was, therefore,

indisputably relevant. Maryland Rule 5-401 defines "Relevant Evidence":

> "Relevant evidence" means <u>evidence having any tendency to make the existence of any fact</u> that is of consequence to the determination of the action <u>more probable</u> or less probable <u>than it would be without the evidence</u>.

(Emphasis supplied.)

Evidence that Mack was regularly seen at 5404 Midwood Avenue before March 13, 2018, made Sergeant Mercado's identification of Mack as one of the persons fleeing 5404 Midwood Avenue on March 13, 2018 "more probable… than it would be without the evidence."

Maryland Rule 5-402 establishes that relevant evidence is generally admissible:

> Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, <u>all relevant evidence is admissible</u>. <u>Evidence that is not relevant is not admissible</u>.

(Emphasis supplied.) The evidence being challenged here was unquestionably relevant. The criminal agency of Mack was the critical fact to be proved in the case against him.

Maryland Rule 5-403 provides, however, that even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice."

> Although relevant, <u>evidence may be excluded if its probative value is substantially outweighed by the</u> <u>danger of unfair prejudice</u>, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

(Emphasis supplied.) The present contention is based on Mack's reading of Rule 5-403. In reading and applying Rule 5-403, there is among defendants a pernicious inclination to ignore the qualifying modifier "unfair" before the noun "prejudice". They prefer to weigh "probative value" against all "prejudice" and are loathe to restrict the weighing process to one of "probative value" against only "unfair prejudice." They conflate, moreover, "probative" with "necessary" and demean all State's evidence beyond that strictly

necessary to satisfy the burden of production as "unnecessary" and, therefore, of little weight in the balancing process. If the State puts on more than a minimal case, the prejudicial impact of the State's stronger case becomes "unfairly prejudicial." That, however, is not the case.

In Oesby v. State, 142 Md. App. 144, 166, 788 A.2d 662 (2002), this Court spoke of the analytic necessity of keeping ones focus on the full phrase "unfair prejudice" rather than the unadorned word "prejudice" alone.

> It is the failure to appreciate this distinction that leads many analyses astray. There is frequently a tendency to conclude that if the State's case is otherwise a strong one, the probative value of "other crimes" evidence is proportionately diminished. That is not the case. Probative value does not depend on necessity. When we are talking only about the legitimate prejudice that inevitably results from competent evidence enjoying a special or heightened relevance, there is no downside to making a strong case even stronger.

(Emphasis supplied.)

Mack's thesis, moreover, is a non-sequitur. He argues that the only charge against him was the possession of a handgun on March 13. He argues that any evidence as to his activities, his behavior, or his whereabouts prior to March 13 was irrelevant to his possession of a handgun on March 13. His argument is clear.

> The charges against Mack rendered the background information presented by the State irrelevant because the jury was only required to decide whether Mack actually possessed a firearm when he was seen in the backyard on March 13, 2018. Mack's presence inside or near 5404 Midwood during the days or weeks before the warrant was not probative of the crimes before the jury. This is especially so because (1) Mack was not on trial for constructively possessing a firearm at any time, let alone before March 13, 2018, and (2) Mack did not assert in his defense (directly or through cross-examination) that he had never been to 5404 Midwood. Consequently, the fact that Mack had been observed by Ofc. Zimmerman at 5404 Midwood on some undisclosed dates while it was under surveillance did not tend to prove that Mack was the person seen by Sergeant Mercado on March 13, 2018.

More importantly, any probative value on the issue of identity was substantially outweighed by the risk of unfair prejudice to Mack from evidence associating him with other crimes occurring at that location before March 13, 2018.

(Emphasis supplied.)

Officer Zimmerman's testimony, of course, was not offered to prove that Mack possessed a handgun on March 13. It was offered to prove that Mack was observed in and around 5404 Midwood Road on a number of occasions on the days just before March 13. That information corroborated the testimony of Sergeant Mercado that it was, indeed, Mack who was fleeing 5404 Midwood Road on March 13 in possession of a handgun. What was corroborated was not the possession of the handgun but the identification of Mack. Mack's possession of the handgun may have been limited to March 13; Mack's identity as Mack, however, was not so limited.

Mack's argument that the testimony of Officer Zimmerman was prejudicial is based upon the fact that the warrant to search 5404 Midwood Road was drug-related and that that fact tended to suggest that Mack had been involved in drug-related crimes. Judge Handy's ruling was that the observation of Mack at 5404 Midwood Road on prior occasions was relevant and further that the probative value outweighed any unfair prejudice.

> [DEFENSE COUNSEL]: I laid that-- I built upon that. My argument is prejudicial v. probative. I don't see how it's probative of March 13th.

> THE COURT: It's-- it's circumstantial evidence that ties your client to that address where they were about-- where they did the search and seizure warrant and why it would be him that's coming out the window. It's certainly probative.

> [DEFENSE COUNSEL]: I guess the issue I have is that if-- I go to numerous establishments. We go to people's houses--

41

THE COURT: Right. <u>And if you were arrested coming out of the back of one of those establishments then someone can say, oh, I've seen him go there numerous times. He's not identifying your client as having the gun</u>, running out of the back<u>, but he's tying him to that location</u>. So you[r] motion in limine is denied. <u>It's definitely relevant and more probative than prejudicial</u>.

(Emphasis supplied).

Judge Handy made that discretionary ruling and appellate courts are admonished to be highly deferential to such exercises of discretion by the trial judge. That standard of deferential review was emphatically articulated in <u>Oesby v. State</u>, 142 Md. App. at 167-168.

<u>This final balancing between probative value and unfair prejudice is something that is entrusted to the wide discretion of the trial judge</u>. The appellate standard of review, therefore, <u>is the highly deferential abuse-of-discretion standard</u>. The fact that we might have struck the balance otherwise is beside the point. We know of no case where a trial judge was ever held to have abused his discretion in this final weighing process. As a practical matter, that will almost never be held to have occurred. <u>A properly disciplined appellate court will not reverse an exercise of discretion because it thinks the trial judge's decision was wrong</u>. <u>That would be substituting its judgment for that of the trial court</u>, which is inappropriate if not forbidden. Reversal should be reserved for those rare and bizarre exercises of discretion that are, in the judgment of the appellate court, not only wrong but flagrantly and outrageously so. In this case, we see no faint or distant glimmer of even arguable abuse.

(Emphasis supplied.) Judge Handy did not abuse her discretion.

## A Need For Disciplined Appellate Advocacy

Before we conclude our consideration of this contention, a brief note seems appropriate about appellate advocacy. One aspect of this concerns making the procedural posture of a challenge clear. In addition to the internal substantive merits of any legal issue, it is vitally important that the parties properly inform the Court about the appellate posture of any issue submitted to the Court for its decision. The precise posture of an issue can

42

determine, for instance, what standard of review will be brought to bear upon it. It can thereby determine what the proper appellate result should be. We may respond very differently to a preserved challenge, for instance, than we might to an unpreserved challenge.

In this case, the appellant Mack sought to persuade the Court that the trial court had erroneously allowed him to be grievously prejudiced by repeated and countless aspersions to the fact that he may have been guilty of previous "bad acts" or "other crimes". Critical to our review of such a claim, of course, would be the extent to which the trial judge had been alerted to such charges and had a proper opportunity to respond to them. As we proceed to examine, one by one, a vast catalogue of such complaints in this case, almost all of them disappear upon closer examination. In one such case, no less than five unpreserved complaints are subsumed in a single argument.

> The State elicited background information from its police witnesses, including the fact that four of them were assigned to investigate drug crimes at the time they participated in the surveillance of Mack and 5404 Midwood. Specifically, Lieutenant James and Sergeant Mercado were members of the Northern District Action Team that was tasked with investigating "[m]id to low-level drug enforcement. Sergeant Mercado, who the State labeled as its key witness in Rebuttal Argument to the jury, identified himself as the supervisor of the "drug unit for the Northern District" at the time of the execution of the search warrant. Ofc. Parker told the jury that he was a member of the "Drug Enforcement Unit, the Gang Unit, Gun Squad". Officer Zimmerman told the jury he was assigned to "the drug unit" and that his task was to "enforce drug laws, which is the street and mid-level drug dealers" and that his drug unit "look[s] for violent offenders." Unfortunately, Mack did not object to these background facts so their admission is reviewed on appeal for plain error. That analysis, however, needs to account for the fact that there was only one logical use by the jury—to infer that the criminal investigation that preceded March 13, 2018, was a drug related investigation even though Mack was not charged with any crimes occurring before March 13, 2018.

(Emphasis supplied.)

Preserved and unpreserved objections alike were there aggregated together with no distinction between them. Although "plain error" was casually alluded to, not once was plain error notice actually requested. It was simply referred to as a universally available alternative to the preservation requirement. After stating that "Mack did not object to these background facts," the hard but overwhelmingly dominant reality is not, as Mack states, that "their admission is reviewed on appeal for plain error" but that their admission will probably not be reviewed on appeal at all. Even without a glimmer of a request for plain error notice, is Mack suggesting that all non-preserved objections will automatically be reviewed for plain error? The final sentence of the paragraph strongly suggests that the non-preserved argument needs to be considered just as if it had been preserved. Contrary to Mack's assertion, "that analysis," with respect to an unpreserved issue, does not "need to account for" anything. The thrust of the entire paragraph is that non-preservation does not matter. This is a flagrant instance of undisciplined appellate procedure, and a total ignoring of any proper focus on the precise procedural posture of a challenge.

Another instance of slack discipline is the attribution to the testimony of the witness words that were actually spoken in the questions of the Assistant State's Attorney. In his brief, Mack made the following doubled-barreled claim:

> Officer Zimmerman told the jury that he was "specifically interested in [Mack] in terms of executing the Search and Seizure Warrant." Officer Zimmerman also told the jury that Mack was "the subject of the investigation leading up to the search and seizure [warrant]."

(Emphasis supplied.)

44

Officer Zimmerman, in fact, did no such thing. Both of those quotations are nothing more than the questions of the Assistant State's Attorney. The actual testimony of Officer Zimmerman was, in each of those instances, a simple and monosyllabic "Yes." The actual testimony of the witness, of course, would be evidence. The questions of the prosecutor, by contrast, are not evidence. In this instance it may not have made much difference, but it does not represent tight appellate discipline.

The third instance of slack (or non-existent) appellate discipline, however, was far more grievous. On what may have been one of the most critical issues in the case against Mack, Mack's brief gives a completely inaccurate, and indeed false, account of what actually happened at trial. Our focus is on pages 16 and 17 of Mack's brief. Under the subhead "Prejudicial evidence offered as identity evidence," the brief recites:

> Officer Zimmerman told the jury that he knew Mack "through photographs, through prior surveillances and [ ] through information from informants… and [from places] he was known to frequent at the time."

(Emphasis supplied.)

What Mack critically neglects to mention, there at the top of page 16 or anywhere else in his brief, is that in the middle of that exchange, Mack objected and Judge Handy sustained Mack's objection. She ruled that "information from informants" had been improperly referred to and she directed the jury to disregard it.

On appeal, however, Mack still considers this reference to informants to be a significant part of his attack on "background information" used for identification, and, at the bottom of page 16 and top of page 17, returns to that testimony by Officer Zimmerman by offering from the transcript the full and ostensibly verbatim quotation. The problem is

that the quotation is far from full and verbatim. For comparison purposes, we offer first the original testimony from page 138 of the trial transcript. We highlight in **BOLD** and in **ALL CAPS** the three lines in the original transcript that were subsequently dropped from Mack's version of the quotation.

> [ZIMMERMAN]: I knew what he looked like through photographs, through prior surveillances <u>and also through information from informants</u>.
>
> **[DEFENSE COUNSEL]: OBJECTION, YOUR HONOR.**
>
> **THE COURT: SUSTAINED AS TO THE INFORMATION FROM INFORMANTS. PLEASE DISREGARD THAT.**
>
> [THE STATE]: So, when you say prior surveillance, what do you mean by that?
>
> [ZIMMERMAN]: So, covert surveillance and then also just being around the areas where he was known to frequent at the time.

(Emphasis supplied.)

> At the top of page 17 of Mack's brief, Mack's version of the quotation is as follows:
>
> [ZIMMERMAN]: *I knew what he looked like through photographs, through prior surveillances and also through information from informants.*
>
> [THE STATE]: So, when you say prior surveillance, what do you mean by that?
>
> [ZIMMERMAN]: So, covert surveillance and then also just being around the areas where he was known to frequent at the time.

(Emphasis in Mack's original.)

There was no mention there of Mack's objection or of Judge Handy's sustaining of that objection or of her directing the jury to disregard those words that Mack later chose to emphasize. There was not so much as a dotted elision to indicate that something had been

46

left out. There would seem to have been no reason why the words "through information from informants" could not have been dropped from a sanitized quotation, unless he wanted it in there. The only clue that Mack left at the scene of his editorial elision was the parenthetical direction: "(Objection and ruling omitted but discussed in Subsection C, below.)" Subsection C covers pages 17, 18 and 19 of Mack's brief.

We have scrutinized Subsection C on a line-by-line basis and can find no remote mention of Judge Handy's sustaining of Mack's objection. Subsection C makes reference to eight separate occasions where Mack objected to background information being used for identification purposes. On each and every occasion, Judge Handy denied the objection. This critical single occasion where the objection was sustained was not remotely alluded to, here in Subsection C or anywhere else in Mack's brief. The message conveyed by the brief, therefore, was either that an objection had never been made or that the objection was denied, and that testimony about "information from informants" in relation to Mack was received in evidence.

Such a flatly erroneous conclusion could easily have slipped under the appellate radar. Appellate courts are supposed to be able to rely implicitly on the accuracy and the completeness of appellate briefs. Standard procedure does not require an appellate court to take every quotation from a brief and to check it out, line by line, against the original transcript. In this case, the reference to information from informants, moreover, was the type of potentially prejudicial evidence that might well have caught the attention of the appellate eye. The mistake in the case could readily have been a gamechanger.

We are not opining as to whether such a mistake in this case was advertent or inadvertent. We are simply taking the occasion to note the absolute importance of the appellate court's being able to rely upon rigorously disciplined advocacy by those who appear before it and upon the punctilious examination and recitation of every fact.

## "Praise the Lord and Pass the Ammunition"[5]

The final contention by the appellant Mack, by contrast, is an effective teaching tool. The lesson is that sometimes an obvious answer can be well-hidden simply by virtue of its being so obvious. Mack's argument was that the evidence was not legally sufficient to show that the ammunition in issue was actually ammunition. The gun shown to have been in the possession of Mack was a .357 Magnum. It contained a cartridge in each of its chambers. Those cartridges were the ammunition in issue. Maryland Code, Public Safety Article, Sect. 5-133.1 defines "ammunition" as: "a cartridge, shell, or any other device containing explosive or incendiary material designed and intended for use in a firearm."

The very title of the contention alleged that the State had not presented legally sufficient evidence to show that even one of the cartridges contained "explosive or incendiary material designed and intended for use in a firearm." In the appellant Mack's brief, the entire argument, without any citation of authority, consists of a bare seven lines:

> An element of the crime is the existence of an explosive or incendiary material. Expert testimony that the object would be expected to contain such matters should not be accepted as legally sufficient proof without the expert opening and testing the substance of one cartridge to determine if his opinion could be validated. The expert did not even testify that the weight of the

---

[5] A popular World War II fighting song, written by Frank Loesser in 1942. It was inspired by an alleged incident involving a Naval Chaplain when his ship was attacked by Japanese aircraft.

object was consistent with a cartridge that contained explosive material. There is no need to open every cartridge, but <u>without any being shown to actually contain the required material, the State failed to meet its burden to prove the crime</u>.

(Emphasis supplied).

In responding, the State, in its brief, went to elaborate lengths to establish that circumstantial evidence may be sufficient to show that at least one of the cartridges contained explosive material. In its brief, the State argued:

> The testimony of the firearms examiner, coupled with the circumstantial evidence, sufficed to establish that the cartridges contained incendiary material. That is, the ammunition was recovered inside a gun, and the jury could infer from that fact that the ammunition would perform as intended— as live rounds. From there, it could infer that the ammunition contained the incendiary or explosive material required under the statute.

At the end of the State's case, the appellant Mack moved for a judgment of acquittal on this charge, arguing that the State had not established "that the cartridges in fact had gun powder in them." After politely listening to argument on this issue by both parties, the trial judge denied the motion.

Carried away by pedantic minutiae, all parties blithely ignored the testimony of Kevin Beardsley, the ballistics examiner, that apparently with one of the cartridges found in the .357 Magnum, he successfully test-fired the weapon and found it fully operational. Voila! Put down the chemistry textbook and simply pull the trigger! From the actual explosion of the cartridge, we may, as a matter of law, infer that the cartridge had explosive potentiality. More broadly, from the actual happening of an event, one may infer that the event had the potentiality for happening. <u>Res ipsa loquitor</u>! In terms of Aristotelian logic, our holding is:

49

All cartridges that actually explode had explosive potentiality.

The cartridge in this case actually exploded.

**THEREFORE**, the cartridge in this case had explosive potentiality.

Quod erat demonstrandum. This was an evidentiary slam dunk!

**An Arguendo Alternative**

In considering this contention about the quality of the ammunition, we have proceeded on the assumption that when the .357 Magnum was test-fired, the cartridge that was fired was one of the five cartridges taken from the chamber of the .357 Magnum. We make the assumption because it is that version of the evidence most favorable to the State's case. As the Court of Appeals explained in Titus v. State, 423 Md. 548, 557, 32 A.3d 44 (2011), "This Court reviews an issue regarding the sufficiency of the evidence in a criminal trial by determining 'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'", quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). (Emphasis supplied.)

Kevin Beardsley testified as an examiner for the Firearms Examination Unit of the Baltimore City Police Department. The .357 Magnum possessed by Mack was State's Exhibit 14. State's Exhibit 15 consisted of the five .357 cartridges that had been recovered from the .357 Magnum. Officer Beardsley described taking both State's Exhibit 14 and State's Exhibit 15 "into the firing range." There was by Officer Beardsley, moreover, never any specific mention of any other cartridge, such as, e.g., part of the supply or stock on the shelves or in the drawers of the Firearms Examination Unit.

The identification of the specific cartridge that was test-fired simply was not recognized by anyone as a possible issue in the case. There was no direct testimony with respect to it. No one paid any attention to what was a non-question. It is conceivable, therefore, that the cartridge that was actually test-fired was a neutral cartridge supplied by the Firearms Examination Team rather than one of the cartridges contained in State's Exhibit 15. This, of course, would be a version of the evidence less favorable to the State's case.

Although in assessing the legal sufficiency of the evidence, we are admonished to take that version most favorable to the State's case, we will, purely arguendo, look at that version of the evidence less favorable to the State's case. Even if, hypothetically, the cartridge that was actually test-fired had not been one of those that constituted State's Exhibit 15, the evidence in this case, we hold, would still have been legally sufficient to prove that the alleged ammunition was, indeed, operable ammunition.

We are by no means certain that if an item looks like a cartridge and has been taken, along with four counterparts, from the chamber of an operable gun that a factfinding jury would not be permitted to infer that the item was ammunition, particularly when that item has been under the scrutinizing gaze of a firearms examiner. If an artillery shell turns out to be a dud, is it no longer an artillery shell? If a bomb fails to detonate, is it no longer a bomb? Fortunately, we are not in this case called upon to decide such close questions, because we have far more.

Officer Beardsley was asked specifically to describe the five cartridges that had been taken from the .357 Magnum.

[THE STATE]: Okay. I want to direct your attention to what's, to State's Exhibit 15, the rounds?

[BEARDSLEY]: Uh-huh.

[THE STATE]: And can you describe how those work?

Officer Beardsley described the ammunition now in issue:

[BEARDSLEY]: Well the cartridge is, <u>inside of this there is a powder. Gun powder</u>, it could be nitro (indiscernible), depends on the manufacturer and the year.
…
[BEARDSLEY]: Okay. On the outside where the bullet is, it's a jacketed hollow point, which, what that means is that there is, it's a hollow grove on the inside of this, inside of the bullet and then it's surrounded by a copper jacket. And then <u>at the very back of it, it houses the primer, which is what's used to detonate the explosive material or the gun powder, which allows rapid expansion of gases to allow the bullet to be expelled out the barrel</u>.

(Emphasis supplied.)

Even if, therefore, one of the cartridges possessed by Mack had not actually been test-fired, the evidence was nonetheless sufficient to permit a reasonable inference that the cartridges qualified as contraband ammunition. The State's most favorable version: "The cartridge exploded." The State's less favorable <u>arguendo</u> version: "The cartridge could have exploded." Take your pick.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID IN EQUAL MEASURE BY APPELLANTS.**